## PALACINE OIL CO. v. PHILPOT.

No. 19388. Opinion Filed April 15, 1930.

Rehearing Denied July 1, 1930.

Commissioners' Opinion, Division No. 2.

Geo. N. Otey, Brown & Williams, and Hatchett & Ferguson, for plaintiff in error.

Hayes & Hayes, and MacDonald & Mac-Donald, for defendant in error.

DIFFENDAFFER, C. This is an action commenced by Mary Jane Philpot, a minor, hereinafter referred to as plaintiff, against the Palacine Oil Company, hereinafter referred to as defendant, to recover damages for personal injuries, alleged to have been received by reason of the negligence of defendant.

The petition, in substance, alleges that defendant, among other things, is engaged in the business of selling and distributing gasoline. and in that connection owns and maintains at various places tanks or reservoirs with pumps connected therewith which it furnishes to its customer, the tanks being installed underground, which tanks and the pumps connected thereto are furnished and installed by defendant for the use of the customer and loaned by defendant to its customers free of charge, except for the consideration for the use thereof the customer shall buy gasoline exclusively from defendant; that under such arrangement defendant furnished and installed a tank and pump for the use and benefit of Philpot Brothers at the village of Cade, same being installed and put in operation by defendant under an oral agreement and written receipt to the effect that said property was owned by defendant and to be used by Philpot Brothers only so long as Palacine Oil Company products were sold at said place. By amendment to the petition, the alleged written receipt was attached, and is as follows:

"Palacine Oil Company,

"Ardmore, Okla.

"Receipt for Property and Acknowledgment of Ownership of same.

"The following property has been installed in my place of business. Location Philpot Bros. Cade, Okla. Article 1-1 gal stroke Bowser Pump, 1-185 Ga. underground tank.

"It is distinctly understood that the above-described property is owned by the Palacine Oil Company of Ardmore, Okla., and is loaned to the undersigned only so long as Palacine Oil Company's products are sold at this place.

"Witness H. O. McCarus. Philpot Bros.

"Dated this the 7-2 day of ____A. D. 1924."

The allegations of negligence were, in part:

"That wholly in disregard of its duty to properly install said storage tank and pump, and in violation of its duty to this plaintiff and to others living in the community where said gasoline was stored, the said defendants, its agents, servants, and employees, negligently, carelessly, and without due regard to its duty to the plaintiff and to the public generally, installed said storage tank and pump and all connections pertaining thereto in such a manner that gasoline deposited in said tank by the said defendant, its agents, servants, and employees, was permitted to leak from the containing tank, and in escaping from said tank seeped through the ground or reservoir northwest of the mercantile establishment of Philpot Brothers, and which was used by this plaintiff and other members of her family for the purpose of obtaining water for drinking and household purposes; that said storage tank, so improperly installed by the said defendant,

its agents, servants, and employees, was permitted to remain in that condition for a period of 14 months; that gasoline so stored and deposited therein by the said defendant, its agents, servants, and employees, was permitted to leak therefrom at the rate of from three to five gallons per day; that said leakage and seepage from said tank in the natural course of drainage entered the said cistern or reservoir, and there accumulated for sometime; that the said defendant, its agents, servants, and employees, were repeatedly warned and notified that said tank was leaking, but to remedy the same the said defendant, its agents, servants, and employees wholly failed, neglected, and refused to so do, notwithstanding that the said defendant, its agents, servants, and employees, were thoroughly conversant with the danger of permitting said gasoline to escape and in escaping to accumulate in any quantity at one place and be subject to contact with fire or excessive heat."

It was then alleged:

"That, on the 30th day of June, 1925, a great quantity of said gasoline by seepage and drainage had found its way into said cistern or reservoir above described due to the gross negligence of the said defendant, its agents, servants, and employees; that this plaintiff, and the owners and operators of the store at which said pump and storage tank was maintained by the said defendant were ignorant of the fact that said gasoline had been by said defendant permitted to escape into said cistern and were ignorant of the dangerous quality of said gasoline when so permitted to leak and accumulate, and this plaintiff and those using said cistern for the purpose of obtaining water, this plaintiff being a minor of very immature years and of the actual age of less than 14 years, not knowing of the danger of placing a lighted flame in said cistern, did so on said date with the result that said gasoline, so grossly, negligently permitted to escape and accumulate by said defendant, exploded in said cistern or reservoir, hurling this plaintiff a distance of more than 30 feet and setting fire to her clothing and burning her all about the body."

Then follows specific allegations as to the nature and extent of the burns upon her face, limbs, and body; and it is alleged that, as a result thereof, plaintiff was confined to the hospital for approximately 15 months, and that she suffered great physical and mental pain, and was permanently injured, and that, as a result of her injuries, she has been compelled to expend $1,520 for medical treatment. hospital fees, etc. Damages in the sum of $101,520 were prayed for.

To this petition, a general demurrer was filed, which being overruled defendant answered by way of general denial, pleaded

contributory negligence, and further pleaded that plaintiff's injuries, if any, were caused by the negligence of her father and next friend, R. C. Philpot, and were not due to the negligence of defendant.

The cause was tried to a jury, resulting in a verdict and judgment in favor of plaintiff in the sum of $15,000. To reverse this judgment, defendant brings this appeal, and assigns some 22 alleged errors. These assignments are submitted under some 11 propositions, some of which are subdivided into several points. The alleged error in overruling defendant's motion for new trial is included in each of these propositions.

The first proposition submitted is, in effect, that the petition as amended did not state a cause of action in favor of plaintiff and against defendant, and, under this proposition, defendant presents the assignments that the court erred in overruling defendant's demurrer to the petition; that the court erred in refusing to render judgment for defendant on the pleadings and opening statement of plaintiff's counsel, and error in overruling defendant's objection to the introduction of any proof.

These assignments all go to the question of whether or not the amended petition states a cause of action in favor of plaintiff and against defendant.

Defendant cites and relies upon Ford Motor Co. v. Livesay, 61 Okla. 231, 160 Pac. 901, and cases cited therein and other kindred cases. In Ford Motor Co. v. Livesay, supra, it was held:

"The general rule, subject to certain exceptions not involved in this action, is that a manufacturer or vendor of an automobile is not liable to third parties who have no contractual relations with him for negligence in the construction, manufacture, or sale of such machine."

The allegations in the instant case are entirely different from those in the cases cited. It is not alleged that plaintiff manufactured the tank, or any of its connections, and as manufacturer sold or furnished same to Philpot Brothers. The allegations are that defendant owned and maintained the tank and pump, and, in substance, that it was being used for the mutual benefit of both Philpot Brothers and defendant. The benefit to Philpot Brothers was that it enabled them more easily and readily to supply their customers with gasoline. The benefit to defendant was that it enabled it more easily and readily to market its products.

The question whether or not gasoline is

a dangerous agency must also be taken into consideration.

In Ford Motor Co. v. Livesay, supra, it was pointed out:

"That an automobile is not an inherently dangerous machine has been held by the weight of authority. In Vincent v. Crandall & Godley Co., 131 App. Div. 200, 115 N. Y. Supp. 600, it was held that motor vehicles cannot be placed in the same category as locomotives, gunpowder, dynamite, and similar dangerous machines and agencies, and the rules of law applicable to dangerous instrumentalities do not apply."

The case of Goodlander v. Standard Oil Co., 63 Fed. 401, is also cited and relied upon by defendant, and is claimed to be "peculiarly like the case at bar." We think the facts therein entirely different. There the oil company had shipped a carload of crude petroleum from Lima, Ohio, to the Ft. Scott Gas Company at Ft. Scott, Kan. The car used was a tank car equipped with a discharge pipe projecting about 6 inches from the bottom. Within the tank the discharge pipe was fitted with a heavy valve to prevent the escape of oil. The employees of the gas company were sent to discharge the oil from the car into the reservoir of the gas company located near a flour mill owned by a third party. The car was placed directly opposite a window in the furnace room of the mill. Oil was observed to be dripping from the drain pipe. The servants of the gas company undertook to draw the oil from the car to the reservoir through a pipe laid by the gas company. One of them went on top of the car and examined an iron rod which extended from the top of the car to the valve, which was in a position which indicated that the valve was closed, so as to prevent the oil from escaping. This information was communicated to the other servant, who then went beneath the car and with a wrench undertook to remove a cap which was screwed over the end of the discharge pipe for the purpose of connecting the discharge pipe with the pipe leading to the reservoir. When this cap was removed, it appeared that the valve was not closed and the oil flowing out of the tank could not be controlled, and it ran out upon the ground and into the furnace room of the mill and became ignited by the fire in the furnace and destroyed the mill. An examination of the tank car after the fire disclosed that it contained no valve. The mill owner sued the Standard Oil Company. The action was predicated upon negligence in omitting to have a proper valve in the outlet of the tank car. The oil company was held not liable, it being held that the negligence of the oil com-

pany was not the proximate cause of the injury. In the opinion, the court said:

"There was here no contractual relation between the parties. Any duty arising out of the contract was due to the gas company, not to the plaintiff. If, by reason of the shipment of the petroleum, a legal duty arose in favor of the plaintiff, it was a duty distinct and apart from the contract,—a duty implied by law. The duty, then, upon which the plaintiff must rely, was a duty owing by the defendant to the public. The law imposes the obligation that one should so use one's property that injury should not result therefrom to another. This duty, however, is not absolute; but one is responsible for negligent use, for failure to do or forbear that which the law requires to be done or forborne in respect of the use. If the failure to provide a valve was in breach of a duty owing to the public, it must be because the character of the shipment was such and so dangerous that the defendant owed the duty to all who might in any way be brought in contact with it, to so protect and guard it that harm therefrom should come to no one. One who uses a dangerous agency does so at his peril, and must respond to the injuries thereby occasioned, not caused by extraordinary natural occurrences, or by the interposition of strangers."

It was held that crude petroleum may not properly be classed as a dangerous agency. The oil company had nothing to do with the construction or installment of the pipe leading from the reservoir to the tank car. How different would the case have been had the car contained gasoline instead of crude oil, and the oil company been responsible for the installation of the pipe line and the gasoline had escaped by reason of a defect in the line installed by the oil company?

The cases cited are not in point, because of the material difference in the facts.

It is contended that gasoline is not of itself an inherently dangerous agency. This contention cannot be upheld. In O'Hara v. Nelson, 71 N. J. Eq. 161, 63 Atl. 836, speaking of the nature of gasoline, it is said:

"It is so readily inflammable that it can scarcely be said to have any 'flash point'. Flame coming in contact with it will almost inevitably and invariably ignite it without any appreciable period of previous heat. If gasoline is brought in contact with flame, when the gasoline is unconfined within narrow limits, it will ignite without exploding. But if the gasoline is confined, and has been vaporized by coming in contact with the air, a gas or vapor is formed which, when ignited, explodes with all of the incidents connected with the most disastrous character of explosion."

In addition thereto, it is common knowl-

edge that almost wherever gasoline is stored or distributed, prudent persons who handle it post signs of warning and caution against smoking, etc., and extra caution is taken to avoid explosion and fire. It may safely be said that it is almost universally recognized as a more than ordinarily dangerous commodity.

This, we think, disposes of defendant's contention that he owed plaintiff no duty because there was no contractual relation existing between her and the defendant. Defendant owed her the same duty which it owed the public generally in the handling of a dangerous agency.

Without considering separately each point presented under this proposition, we conclude that the petition of plaintiff stated a cause of action, and that there was no error in overruling the demurrer thereto, and other similar orders.

We pass for the present the second proposition, which goes to the introduction of certain evidence, and pass to propositions Nos. 3 and 4, which are presented together and go to the alleged error in overruling the demurrer of defendant to plaintiff's evidence, and refusing to direct a verdict for defendant. This presents the question of the sufficiency of the evidence, and requires an examination thereof. Briefly, it may be said that the evidence shows the arrangements for the installation of the tank and pump, as alleged in the petition, and that the tank and pump together with all connections were installed by defendant; that same were installed sometime about the 1st of June, 1924. At that time, W. T. Lindsay was the owner of and operated a store in the town of Cade. He made arrangements with defendant for the installation of the tank and pump. He bought 120 gallons of gasoline from defendant, which was placed in the tank. He operated a very short time when he decided to move his business to Bokchito. At that time he had drawn 24 gallons of gasoline from the tank. About 20 or 30 days thereafter, he arranged with Philpot to turn the filling station over to him. Philpot agreed to buy the gasoline then in the tank, and Lindsay and Philpot, in the presence of H. O. McCarver, the agent of defendant, who had installed the tank, undertook to determine the amount of gasoline then in the tank. The measurement showed that the tank then contained but about 2½ gallons, it thus appearing that some 93 gallons had either leaked or had been drawn from the tank. Some discussion was then had about whether or not the tank leaked. About that time Philpot took charge and signed the receipt heretofore mentioned. Thereafter, defendant continued to operate the business of selling and delivering gasoline to him from time to time. The record discloses that a number of times, Philpot and McCarver discussed the apparent discrepancy between the amount of gas placed in the tank and that drawn out in the course of the business. This continued until about April, 1925, when Philpot requested defendant to put in another and different type of pump. This was done, the new pump being of that kind which has a glass bowl or tank thereon, which could be pumped full and the amount of gasoline therein would be visible; that after this pump was installed, Philpot called McCarver's attention to the fact that when the glass bowl would be filled with gasoline, it would not remain full, but the amount therein would gradually decrease. Philpot appeared to think the gasoline was leaking out, but McCarver assured him that whatever gasoline might run back out of the bowl flowed back into the tank, which was one that would hold 180 gallons, and was buried several inches below the surface of the ground.

There is some evidence that what was referred to was what was termed the "overflow," that is, when more gasoline was pumped from the tank than the glass bowl would hold, it would overflow, and the surplus would run back into the tank. But Philpot is positive that he called McCarver's attention to the fact that the gasoline in the bowl would gradually disappear.

About April 29, 1925, Philpot had one J. A. McKay in charge of the business. On that date, McCarver delivered some 90 gallons of gasoline, and McKay called his attention to certain sounds he heard while the cap of the tank was off, and told him that he thought the gasoline was leaking out. Philpot complained to McCarver some seven or eight times about an apparent shortage in the gasoline, and on one occasion told him that he could not understand how he, McCarver, could put 190 gallons of gasoline into a 175-gallon tank. Nothing was done towards examining the condition of the tank. About June 1, 1925, Philpot had occasion to take his daughter, plaintiff herein, to a hospital for an operation. He was absent for several days, and upon his return he discovered that the water in a cistern, from which he and some of his neighbors obtained water for domestic use, was unfit for use, and tasted like coal oil. He thought perhaps some one had placed coal oil in the cistern. This cistern was located some 65 or 70 feet from the gasoline pump, and on

the opposite side of the store building. The building had a concrete floor. On June 30th, he determined to test the water in the cistern, and in order to do so drew a bucket of water from the cistern and directed his daughter, plaintiff herein, who had recovered from the operation, to bring him a piece of an old quilt from the store. After soaking this piece of quilt in the water which he had drawn from the cistern, he applied a lighted match thereto, which produced a flame. While doing this he had his back to the open cistern and was some 6 or 7 feet therefrom. In the meantime, plaintiff, who was then some two months less than 14 years of age, and a boy, about 11 years old, went into the store and procured some matches and each lighted a match and at the same time threw them into the open cistern. Instantly a terrific explosion occurred, the force of which hurled her some 30 feet from the cistern. Her clothing was ignited, resulting in extensive and severe burns over almost all of her face, body, arms, and hands. She was taken to the hospital at Durant, where she remained for some eight months. As to the extent and nature of the burns, O. J. Colwick, one of the physicians who treated her, testified, in part:

"A. As a matter of convenience, would it be admissible for me to explain what is called first, second, and third degree burns? By Mr. Hayes: Yes sir. We cannot describe the burns unless we have some way of describing the degree. First degree means burns involving the top layer of the skin. The top layer is what we call first degree burns, and that is of the less severe type. A second degree burn is through both layers of the skin, and the third degree is burns involving the skin, but the tissues under the skin, bones, blood vessels and muscles. Q. When you explain to the jury, explain what part of her body had first degree burns on it? A. __ her face up to the roots of her hair and her neck had first degree burns and her hair was also burned, but not the scalp, and there were some first degree burns on the upper part of her leg and upper part of the chest; there were first degree burns on or about the middle part of the abdomen like where somebody had been wearing a belt after an operation for appendicitis and that is approximately the extent of the first degree burns. Q. Now, the second degree? A. There were second degree burns on a portion of both hips and certain parts of the back and abdomen, and there were some second degree burns on her thigh. Q. Now the third degree? A. There were third degree burns, one here indicating both breasts; both elbows and fore-arms, and on either one or both hands, except the little finger and the part of the hand on that side. There were extensive third degree burns of both hips, both thighs and the bottom side and both sides of her body might call flanks. Some of those burns here and there. Both elbows extended clear to the bone. Q. Doctor, taking her condition when you first examined her and as you have described, and your experience with matters of that kind, what, in your judgment, would have been the most natural result of those injuries? A. We expected her to die."

As to her suffering, he testified, in part:

"Q. What about the suffering? A. It was extreme, severe. Q. For how long a time? A. For a year and a half, I would say. Of course, the suffering was not so intense after about 220 days. * * * A. It would be extremely hard to describe the intensity of her suffering. In the first place the suffering was directed to the burns and lying on the burns would be extreme. The pain she would suffer by being compelled to change her dressing two or three times a day of these months. The dressing had to be changed to keep her clean and to keep the wounds in a healthy condition and there was extreme suffering in having to straighten her arms—Q. Explain that. A. In second or third degree burns, if you don't watch the limbs or fingers or legs, they will draw up when the tissues heal. The scar tissue will draw them up, and they will become permanent and fixed in that shape, and in order to prevent that they have to be straightened constantly and be watched constantly. In addition to straightening them, you have to limber them up, and, in addition to that, we have to apply splints to hold them straight, and they have to be removed two or three times a day, and the surface cleaned, and we didn't deem it advisable to keep her under the influence of morphine, and, of course, there was extreme suffering."

Some 30 or 40 skin grafts were necessary in the course of treatment. Her injuries were shown to be permanent, and at the date of the trial, October 25, 1927, some two years and four months after the injuries were received, two of the wounds were not yet healed. She was greatly scarred and disfigured. A few days after the explosion, defendant, in the presence of several persons, removed the pump and tank. At that time, it was found that there was a leak at a joint or coupling in the pipe leading up from the tank to the pump. No hole or leak was found in the tank itself. Some 12 or 14 gallons of gasoline was found in the excavation in which the tank was located, and the ground was found to be moist with gasoline around the tank. The cistern was located where the surface of the soil was some three feet lower than the surface at the place where the pump was located. The cistern was 19 feet deep, walled with rock

and contained about 5 feet of water. Some two or three weeks after the explosion, J. M. Aiken, the father of the small boy who was with plaintiff at the time of the explosion, made an examination of the soil at several points between the cistern and the place where the tank had been located, two or three of which were through and under the concrete floor in the store building and one or two between the building and the cistern, and found that the soil at each place was then somewhat saturated with gasoline.

Testimony was given by defendant's witnesses, those who installed the tank and pump in the first instance and who installed the new pump, to the effect that all connections in the pipe were properly made in the usual manner and sealed and painted over with a mixture of litharge and glycerine, the substance usually used for such purpose, and tested for leaks before being covered and found to be free from any leaks. When the pump was removed, it was shown that there was a dent in the housing thereof, which was composed of heavy sheet iron, about 16 or 18 inches from the bottom. The evidence was in direct conflict as to whether or not this dent was present when the pump was installed; defendant's witnesses testifying that it was not, and plaintiff's witnesses testifying that it was. There was no showing whatever as to how it came to be there. There was some testimony to the effect that when the tank was being removed, and at the time the defect was disclosed in the coupling or joint of pipe, H. O. McCarver stated in reference to the coupling, in substance, that he had had it made at Bokchito, and thought it was worthless at the time he put it on. This testimony was strenuously objected to at the time, and is the basis of one of the specifications of error. This will be noticed later. McCarver denied making the statement. Plaintiff testified that she was 13 years and 10 months old at the time of the accident, and as to the occurrence, in part, as follows:

"Q. Mary Jane, did you know anything about gasoline and how it would explode and the danger of it exploding, or anything about it? A. No, sir. Q. Had you ever had any experience with it? A. No, sir. Q. Now, the day of the accident, what were you doing just before the accident? A. We was playing around, the little boy and me. Q. How old was he? A. 11. Q. You playing around the store? A. Yes, sir. Q. What was your father doing? A. He and some men were out about the well talking and discussing what might be in the well —what might be in there. Q. While they were out

there, state what you and the little boy were doing? A. We was talking to each other and asking one another questions. Q. What did you do? A. We went in the store and got a match, and was going to see if it would burn, and struck a match and threw it down in the well. We both struck it about the same time. Q. How long after you threw the match in the well until the explosion? A. Just an instant. Q. Which one of you threw the match in first? A. Just about the same time. Q. Were you all expecting an explosion? A. No, sir, we wasn't. Q. What had the discussion around there been as to what was in the well? A. My father thought it was coal oil. Q. What was the next thing you knew? A. I was getting up about 30 steps from the well. Q. Was you unconscious? A. Spells of consciousness and unconsciousness. Q. Did you realize how bad hurt you were? A. No, sir. Q. What did they do with you? A. They took me to the house and got doctor's aid. Q. How long was it before they brought you to the hospital? A. About three hours. Q. Then you stayed in the hospital how long? A. Almost eight months. Q. While in the hospital did you suffer any, Mary? A. Yes, sir. Q. Can you give the jury any idea of your suffering? A. I don't believe I could. Q. Tell what it was that hurt you and how long it hurt you? A. (Shakes her head, crying.) Q. Did it hurt you to lie on the bed? A. There wasn't any well place for me to lay on. Q. When they dressed your wounds, did that hurt? A. Yes, sir."

It is conceded that, upon the presentation of a motion for a directed verdict, the question presented is, whether admitting the truth of all the evidence that has been given in favor of the party against whom the motion is directed, together with such inferences and conclusions as may be reasonably drawn therefrom, there is enough competent evidence to sustain a verdict should the jury find in accordance therewith.

Defendant contends that, under the testimony of the several witnesses who installed the tank and pump, to the effect that same were properly installed, all joints and connections properly sealed and inspected and found free from leaks, and when they left it in either the tank or pipe, and their testimony not being improbable, nor contradicted, must be taken as true, and defendant accordingly be found free from negligence.

In this connection, defendant cites Hubbard Banking Co. v. Koetsch, 105 Okla. 227, 231 Pac. 207, where it was held:

"While the jury are the sole judges of the credibility of the witnesses, yet they will not be allowed capriciously to disregard the

positive, uncontradicted, and unimpeached testimony of witnesses; unless the physical facts or the circumstances surrounding the transaction contradict the positive testimony, or the positive testimony is inherently improbable,"

—and Fleming v. Drew, 88 Okla. 160, 212 Pac. 306, holding:

"When the evidence is uncontradicted, and not inherently improbable, either in itself, or when taken in connection with circumstances, the court is not at liberty to disregard it."

And:

"Where the evidence upon a certain question is uncontradicted and not inherently improbable, either in itself or in connection with any other circumstances, but conclusively establishes the facts presented, it is error to submit questions of fact to the jury, but the court should advise the jury of the conclusive nature of said evidence."

Certainly the testimony of defendant's witnesses did not conclusively establish the fact that the tank, pump and connections were properly installed, in view of the circumstances and uncontradicted evidence showing that the gasoline must have been leaking during the entire time between the original installation of the tank and the explosion herein involved. A sufficient answer to this contention is, that the physical facts and circumstances and conditions shown to exist contradict and tend to refute the testimony of defendant's witnesses at this point. The physical facts and uncontradicted testimony, we think, conclusively show this to be true. Certainly, under the record, the question of negligence in this regard was one for the jury.

Here may properly be considered defendant's contention that, though it may have been guilty of negligence, such negligence was not the proximate cause of the injury. This question is presented under proposition 1, where defendant contends that the petition on its face shows that the alleged negligence of plaintiff was not the proximate cause of the injury, and, again, under proposition 10, dealing with the refusal to give instruction No. 4, offered by defendant, which was in effect a request to direct the jury that, under the evidence, the original negligence of defendant, if any, could not be said to be the proximate cause of the injury. Defendant contends that there were two independent intervening causes, one the action of the father in drawing the water from the cistern and applying a lighted match to the piece of quilt which had been placed therein, thus suggesting to the little girl the idea of casting the lighted match into the well, and the act of plaintiff herself in placing the lighted match in the cistern. It is said that this undisputed evidence "shows that the chain of causation was broken."

Whether or not the negligent act of one sought to be held liable for an injury is the proximate cause thereof, is ordinarily a question for a jury. It is only when the evidence is such that it fails to show any causal connection between the negligent act charged and the injury, that the courts can say, as a matter of law, that the "chain of causation" is broken. The law does not require that the act of negligence be the sole producing cause of the injury. An act which directly produced, or concurred directly in producing, the injury, may be said to be the proximate cause thereof. 32 Cyc. 745.

In Baltimore, etc., R. R. Co. v. State, 33 Md. 542, it is said:

"By 'proximate cause' is intended an act which directly produced, or concurred directly in producing, the injury. By 'remote cause' is intended that which may have happened, and yet no injury have occurred, notwithstanding that no injury could have occurred if it had not happened."

This was quoted with approval and followed in Troy v. Cape Fear, etc., R. R. Co., 99 N. C. 298, 6 Am. St. Rep 521. In Leahy v. Standard Oil Co. of N. Y., 224 Mass. 352, 112 N. E. 950, it was held:

"That the negligence of an employee of defendant oil company, who, in attempting to fill the gasoline tank of a garage, let it flow into the cellar of the garage, and then swept it into a pit in the cellar, may be a concurring proximate cause of injury to an employee of the garage owner from an explosion, on the garage owner negligently letting water into the escaped gasoline, the act of the garage owner need not have been a natural and probable consequence of the act of defendant's servant and one which should have been foreseen."

It cannot be said, as a matter of law, that the negligence of defendant, if any, was not the proximate cause of the injury. There was no error in refusing to direct a verdict for defendant.

We now consider the assignments presented under defendant's second proposition: That the court erred in permitting witnesses to testify as to the alleged statement of H. C. McCarver, the agent and representative of defendant, who had installed the tank and pump, made at the time the tank was being removed, to the effect that he had the connection, which was found to be leaking, made at Bonbito, and that he "didn't think

it was worth a damn when he put it in." Defendant contends that this testimony was inadmissible on any theory or for any purpose. The general rule is, that this class of testimony is not admissible as against a corporation, which can only speak through and by its agents and representatives, for the purpose of showing or proving negligence in the first instance, unless it be a part of the res gestae. The general rule is: That admission made by an agent in a narrative statement of a past transaction cannot be received in evidence against his principal. 22 C. J. 379; M., O. & G. Ry. Co. v. Adams, 52 Okla. 557, 153 Pac. 200; E. Torpedo Co. v. Shelts, 121 Okla. 129, 247 Pac. 974. While the testimony was not admissible for the purpose of proving negligence in the first instance, there is authority for the admission of such evidence for the purpose to which the admission in the instant case seems to have been limited. At the time this testimony was offered, the following record was made:

"By Mr. Hatchett: You cannot prove negligence by a declaration of an agent. The res gestae has no application to this fact here. Right at the time the accident happened, it might be a part of the res gestae but not here. They are taking the tank out of the ground and are trying to prove a statement made by a man purporting to be the agent of defendant. By the Court: The court will permit him to testify under the theory that knowledge of the agent in installing the putting in the thing is imputed knowledge to the principal.

"By Mr. Hatchett: Consider the objection to what he or anyone else said at that time, incompetent, irrelevant, and immaterial, and not binding on the defendant. By the Court: Overruled. By Mr. Hatchett: Exception. Q. What did Austin McCarver say? A. He said 'Had this made' in Bokchito, I understood him to say, 'And I didn't think it was worth a damn when I put it on'."

In Hopkins v. Boyd, 18 Ind. App. 63, 47 N. E. 480, where a somewhat similar question was involved, it was held:

"Evidence of statements made by employees of defendants, after an accident alleged to have occurred through negligence on the part of defendants, though inadmissible for the purpose of proving such negligence, was properly admitted, as tending to show that defendants had knowledge of the conditions then existing."

In Camilla Cotton Oil & Fertz. Co. v. Walker, 21 Ga. App. 603, 94 S. E. 855 it was held:

"Although the admissions of an agent, made outside the scope of his employment, and while not engaged in the business of his principal, are not admissible in evidence against the principal as proof of the facts thus admitted, yet, if there is any other evidence before the jury sufficient to authorize a finding that the facts thus indicated actually existed, the admissions may be proved for the purpose of showing knowledge of such facts on the part of the agent."

Under the peculiar circumstances of this case, we think there was no error in admitting the testimony for the purpose indicated.

Defendant contends, however, that the trial court erred in not instructing the jury that this evidence should be considered only for the purpose of showing knowledge on the part of defendant as to the condition of the connection. If defendant desired to guard against any improper application of this testimony by the jury, it should have asked an instruction limiting it to its legitimate purpose. City of Delphi v. Lowery, 74 Ind. 520.

The ruling of the court on the admission of this testimony appears to have been made in the presence or hearing of the jury, and presumably the jury understood the purpose for which the testimony was admitted.

Defendant further contends that the court in stating the issues to the jury, in effect, told the jury that defendant admitted that the tank and pump were negligently and carelessly installed. The part of the instruction complained of is:

"The defendant further alleges that the gasoline tank and its fittings were installed on the premises as alleged in plaintiff's petition, for the use and benefit of the father of the plaintiff, R. C. Philpot, and that he was the operator of said filling station, and that the plaintiff owed no duty to anyone except R. C. Philpot, and is therefore not liable to third persons for damages sustained."

It is urged that because the petition alleged that the pump and tank were negligently installed by defendant, the instruction, as worded, told the jury that defendant alleged not only that the pump and tank were installed by defendant for the use and benefit of plaintiff's father, as alleged in the petition, but also that they were negligently installed. This contention, we think, is without merit, and that the jury must have understood that all the court meant was that defendant contended that the pump and tank were installed by defendant for the use of plaintiff's father as alleged in the petition. Certainly no intelligent man on the jury could have understood the court to

tell the jury that defendant admitted its negligence in the face of the fact that this one question had been the principal question in dispute, and had been hotly contested before the jury for two days.

It is next contended that the court erred in its instructions as to the measure of damages. The instruction complained of is as follows:

"You are instructed that if you find from the evidence for the plaintiff, under the instructions heretofore given, you will allow such damages as seem to you to be right and proper under all of the facts and circumstances in evidence. In estimating the damages you have a right to consider bodily and mental pain, if any, endured by the plaintiff; loss of time, if any, diminished capacity for labor, if any, future pain and suffering, if any, permanent injuries, if any, and a reasonable amount for medical services, and hospital fees, incurred, or which may be incurred, if any, resulting directly from defendants wrongful acts, if the evidence shows these circumstances to exist."

This instruction is erroneous in that it permitted the jury to take into consideration expense for medical care and attention and loss of time of plaintiff during her minority. These are items of consequential damages for which the father might in a proper case sue and recover in his own right. But we do not think that it was such error as will require a reversal. The amount sued for in the instant case was $101,520. The verdict was for $15,000. The error in the instruction could go only to the amount of recovery. It is asserted in the motion for new trial, and assigned in the petition in error, that the verdict is excessive. Yet defendant neither in its brief nor reply brief urged this question. Defendant cites and relies largely upon Derr Construction Co. v. Gelruth, 29 Okla. 538, 120 Pac. 253. Strict adherence to the rule there announced might require a reversal of this case, but we think a more liberal rule has since been applied in this state in cases of this nature. In St. Louis-S. F. Ry. Co. v. Loftus, 109 Okla. 141, 234 Pac. 607, it was held:

"Where the plaintiff is a married woman, living with her husband, she cannot recover damages for expenses for a physician and medicine in an action for personal injuries, where the items claimed are not paid, and where it does not appear she is liable for payment out of her own earnings, but where such items are drawn into issue and the court instructs the jury that they may consider such items as elements of damages, and the jury finds for the plaintiff in a lump sum for less than the amount sued for, and there is no complaint that the verdict is excessive, and the defendant does not suggest a correction of the instruction at the time it is given, the cause will not be reversed because the court's charge does not accurately define the measure of damages in this respect."

In the body of the opinion, it is said:

"As to the items of expenses for physician, medicine, etc., we think, under the general rule, the defendant is correct in its contention that they are not proper items of damages in a case of this kind, where they are not paid by plaintiff at the time the action is brought, and where she is a married woman and lives with her husband. In such case the duty would devolve upon the husband to pay these expenses, unless, under certain conditions she was to pay the same out of her separate earnings. But it does not appear from the verdict in this case that there was anything assessed for these items of expenses, and the amount of the verdict is not excessive, and the defendant does not complain that the verdict was excessive, but complains only of the instructions of the court to the effect that the jury might take into consideration these items. This being the case, this court has often held that a reversal cannot be urged on this ground."

The court quotes with approval from Ft. Smith & W. R. Co. v. Moore, 66 Okla. 322, 169 Pac. 904, the following:

"It is the duty of defendant in a damage suit to present to the court by way of requested instruction, or in some manner to call the court's attention to the defendant's theory as to what matters the jury may consider in assessing damages. In case of failure on the part of the defendant so to do, and a verdict is rendered for damages which from the evidence is not excessive, and the defendant has made no assignment of error that the verdict is excessive, a cause will not be reversed because the court's charge may not accurately define the measure of damages"

—and concludes as follows:

"When the court gave the instruction complained of, it does not appear, from the record that defendant made any suggestion to the court to correct the same, and did not request a correct instruction as to the measure of damages, but simply sat by and announced an exception, and this court has held in numerous decisions that this is not sufficient objection on the part of the complaining party to urge a reversal on appeal."

Such is the record in the instant case, except that the assignment is made that the judgment is excessive. But, as shown above, this assignment is abandoned.

Defendant does not now contend that the judgment is excessive. We have at some

length herein set out from the record the nature and extent of plaintiff's injuries. Much more might be shown. From the record, we conclude that it would be futile to attempt to describe the extent of pain and suffering which plaintiff must have undergone. The verdict is not excessive and the record is such as to have warranted the jury in returning a verdict for a substantial sum, more than was awarded.

A number of questions are presented going to the correctness of certain other instructions given, and the refusal of certain instructions offered by defendant. We have carefully examined the instructions complained of and conclude that there was no error in giving same. In fact, some of the instructions objected to were given in the exact language of those offered by defendant. We have also carefully examined the instructions offered and refused, and find no error in the refusal thereof.

The judgment should be affirmed.

BENNETT, HALL, HERR, and EAGLETON, Commissioners, concur.

By the Court: It is so ordered.