## CHEATHAM v. RED RIVER LINE et al.

(District Court, E. D. Louisiana. May 30, 1893.)

### No. 12,963.

1. MASTER AND SERVANT—NEGLIGENCE OF MASTER—STEAMBOAT.

    Where a steamboat is stopped by the bank ·of a river, when the water is very high, and the. boat is not moored, but is kept in place merely by the revolution of her wheel, and, a stage plank being run out, the deck hands are ordered to land the freight, and while doing so one of them falls into the river, and is drowned, by reason of a movement in the stage plank, the owners of the boat are liable for his death, since it was caused by their negligence in attempting to land freight without mooring the boat.

2. NEGLIGENCE—PRINCIPAL AND AGENT—MASTER OF VESSEL.

    The master of the boat is not, in such case, jointly liable with the owners, in the absence of proof of any willful or malicious act on his part, since he acted in the matter only as agent of the owners.

3. DEATH BY WRONGFUL ACT—DAMAGES.

    In an action for negligence resulting in a man's drowning, his sufferings after he fell into the water, and before he drowned, cannot be taken into account, since they are substantially contemporaneous with his death.

4. SAME.

    The limit in many of the state statutes, as well as in that of congress, giving damages in case of death, should have weight in fixing the amount of damages to be recovered. Where those statutes are considered, and where the deceased was a steamboat deck hand, 38 years old, who had devoted his wages to the support of his three children, who were at the time of his death 6 months, 2½ years, and 5 years old, respectively, $2,500 is a reasonable amount of damages.

In Admiralty. Libel in personam by Thomas Cheatham, tutor, against the Red River Line and another. Decree for libelant, as against the first-named respondent.

Leonard & Marks, for libelant.
Howe & Prentiss, for claimant.

BILLINGS, District Judge. This is a cause in admiralty brought by the tutor of the minor children of James Brooks, who is alleged to have been drowned through the negligence of the officers of the Valley Queen. The suit is brought against the owners and the master. The damages sought to be recovered are $5,000 damages alleged to have been suffered by the father previously to his death, and $5,000 alleged to have been suffered by the children in the loss of support, service, and society.

The father, James Brooks, who was drowned, was a deck hand hired for the round trip from New Orleans to Shreveport and back. He was drowned at East Point, a point on Red river where the Valley Queen put off some freight. As to precisely what occurred at East Point there is a conflict of testimony; the witnesses for libelant testifying that the incorrect order was given, to take in the stage plank, and the witnesses for the claimant testifying that the correct order was given, to let go the stage plank. There is also an issue presented as to the competency of the fall tender;

and still another, as to the neglect of the master in not attempting to rescue the father, James Brooks, while he was struggling in the water.

The view which I have taken of the whole case renders it unnecessary for me to review the testimony upon either of these three points as to which the testimony is so contradictory, for, as it seems to me, the case must be decided for the libelant upon the facts which are undisputed. These uncontroverted facts are that the boat stopped, and was not moored, or in any way tied, to the bank, and was held at her place simply by the revolution of her wheel; that the stage plank was let down, and Brooks and others ordered to take off the freight which was to be delivered at that point; that for this purpose he went across the stage plank, aided in delivering the freight, and was returning to the boat across the stage plank, when it was, by the "fall," tipped up, one end falling down into the water, whereby the said Brooks fell into the river, and was drowned. The water in the Red river was at a very high point.

The question presented upon these conceded facts is, was it such prudence or diligence as a boat ought to have exercised in behalf of its employes, who must cross and recross the stage plank, to stop and require of them the delivery of freight without the boat being moored, or in some way confined, save by the force of its own revolving wheel? The imminent danger under such circumstances is that, with a swollen river and accelerated current, there could be no certainty that the stage plank could be properly held to allow those who had started to come across to complete their coming; that almost necessarily the turbulence and resistless force of the water would cause such haste in the giving of orders, and confusion in their execution, as, according to the testimony on either side, existed in this case, and such as should have been foreseen, and shows that the landing without mooring really caused the disaster. Where the water is so high it is so dangerous to do what was in this case required of Brooks that the vessel which exacts it commits a fault. In such rapid, and necessarily well-nigh resistless, water, the employes should not be required to cross the stage plank without the boat being in some way moored. If it should be said that there could be no mooring, except to trees, the mooring post being submerged, the reply, as it seems to me, would be: Then the mooring should be to the trees, or the delivery should be made at the nearest point where the boat could be moored, or it should be deferred.

On this point there is little testimony. B. C. Rea, the younger,—the pilot,—alludes to it, but only with reference to the danger to the boat. This ground of the claim of fault on the part of the boat, resulting in the death of Brooks, was expressly set out in the libel, (article 4.) and either party could have proved the usage or custom on the part of expert navigators of the river, but it does not seem to me to require testimony. Whenever to deliver freight without mooring involves, necessarily, certain danger to the crew, it is fault for the boat to attempt it. If the boat does attempt it, and, by

attempting it, in order to save her smokestacks, it becomes necessary to instantly withdraw, or move the boat, while the employes are actually crossing the stage plank, and such is the confusion that the death of one of them follows in consequence of it, it seems to me the paramount cause is the attempt to deliver goods without mooring the boat.

As to the first ground of damage, viz. the sufferings of Brooks after he fell into the water, and before drowning, which is specified in the Civil Code, art. 2315, as a distinct ground of action. In a precisely similar case arising in Louisiana, and governed by the Louisiana statute, it was held by the supreme court of the United States that the pains and sufferings of the drowning person were substantially contemporaneous with her death, and inseparable, as a matter of law, from it. The Corsair, 145 U. S. 335, 12 Sup. Ct. Rep. 949. I think, therefore, the damages must be confined to those arising from the second ground, viz. the loss which the children themselves suffered, in being deprived of their father. The only facts which characterize the loss of the children who bring this suit are these: The children are, respectively, 6 months, $2\frac{1}{2}$, and 5 years old; the father was aged 38 years; was earning the wages of a deck hand. He had been in the habit of devoting all his wages to the support of his children; to pay for their subsistence and rent, per month, $16.50, besides providing for their clothes.

In case of the damages resulting from the death of a person, the law of Louisiana contains no limit as to the amount of damage. This is true of the law of some of the other states. But in the law of many of the states the amount is limited to the sum of $5,000. The only act of congress which authorizes a recovery in case of death fixes the limit of damages at $5,000. The fact of this frequent limit has great weight with me, it is so purely problematic how long the most productive life will continue so. According to Solomon, "the race is not to the swift, nor the battle to the strong. neither yet bread to the wise, nor yet riches to men of understanding, nor yet favor to men of skill, but time and chance happeneth to them all," not alone so far as the length of days is concerned, but so far as concerns a continuance of a capacity and disposition to earn or make money. The fluctuations in business, and its opportunities; the liability to form bad habits; the development of disease which, without ending life, may make its possessor incapable of earning money; the uncertainty which there must be as to the continuance of physical capacity, and the mental and moral purposes requisite for the earning of wages, as well as that as to the existence and continuance of the necessary external conditions,—all these elements make the problem of how long a man's productive life shall be estimated to be one of the greatest uncertainty. There are no tables of productive lives. It is human experience that some lives are almost worthless to those dependent upon them, and some which are, and which promise to be, support and comfort, come to produce nothing but shame and sorrow. In fixing the value of a human life, and in trying to be ju t alike to the injured and the injurer, no chimerical

estimate should be made, but rather should there be a resort to sober judgment. In view of these considerations, I think the damages which the children have suffered by reason of their father's death should be fixed at $2,500.

The suit is brought against the master and owners of the Valley Queen. I do not think the action will lie against the master. He was acting, avowedly, as the agent of others and within the scope of his authority, and he was guilty of no willful or malicious act. His acts are, therefore, by the well-settled principles of law, those of his principals alone. My conclusion, therefore, is that the suit, so far as it relates to the master, must be dismissed, and that the libelant must have judgment against the owners of the Valley Queen, the corporation known as the Red River Line, for the sum of $2,500, with interest from the date of the death of James Brooks, May 17, 1892.