## FIKE et al. v. PETERS et al.

No. 22411.  Oct. 22, 1935.

Rehearing Denied Dec. 17, 1935.

Allen, Underwood & Canterbury, for plaintiffs in error.

Glenn O. Young and Streeter Speakman, for defendants in error.

PER CURIAM. This is an appeal from a judgment rendered in the district court of Creek county for the wrongful death, and pain and suffering endured by Frankie Peters, who was drowned at Sapulpa, Okla. While swimming with companions in a municipal swimming pool, she was drawn by force of suction into the mouth of a large siphon, installed by defendants for the purpose of lowering the surface of the water impounded by the dam in order to more conveniently construct a railroad trestle one-half mile up stream. The deceased was swept from the surface of the water into the mouth of the

siphon three feet below, thereby severely lacerating and bruising her body and holding her fast until she was drowned, the force of the current being so great that men who were summoned were unable to remove her body in time to save her life. These siphons were installed in this public swimming pool without any notice to the public and without sign of warning, guard or protection.

The facts show that some years prior to the occurrence complained of in the plaintiff's petition and as disclosed by the evidence at the trial of this case, the city of Sapulpa, owning a municipal park along Rock creek, constructed a dam in the creek, and at the dam constructed a municipal bathing beach. The dam elevated the surface of the water in the creek by approximately ten feet at the dam and by several feet for a distance of over half a mile up the creek. At a point up stream nearly a half mile from the dam, the creek was spanned by a railroad bridge and trestle of the St. Louis-San Francisco Railway Company.

The defendant E. G. Fike & Company entered into a contract with the railway company to replace the piers under the bridge. In order to more conveniently do so, the defendant E. G. Fike & Company, acting by its manager and agent, the defendant E. G. Fike, decided to drain the water from the swimming pool and creek. To do this, defendants constructed, of oil field casing, two large siphons, which were installed in the swimming pool at the dam. The casing used was twelve inches in diameter, except that in one siphon a section of casing ten inches in diameter was used, constituting the intake. These siphons were so placed that the shorter ends extended into the water above the dam and the longer ends protruded over the dam and down stream. After they had been started and were siphoning, the defendants left them in place to complete the drainage of the pool.

It will be observed that in order to accomplish their purpose, the siphons would be required to have sufficient capacity to not only lift over the dam the volume of the water representing the natural flow of the stream, but also the reserve accumulation impounded behind the dam. This they had sufficient capacity to do, for the surface of the water was being lowered at the time the accident complained of occurred. The point near the dam at which the siphons were installed had for a long time been used as a municipal swimming pool. The public gener-

ally, but more especially boys and women and children, resorted there to bathe.

The siphons in operation obviously created a very real menace to the safety of persons swimming there. When they were being installed, agents of the defendant E. G. Fike & Company were warned of the danger, but despite this fact no signs were posted and no efforts made to protect the mouth of the siphons with guards. Experts differed to some extent as to the effect of the siphons upon the water in the pool. The force of the current at the intake was variously estimated at from 350 to 881 pounds; the volume of water flowing in the pipe, according to one of defendant's witnesses, was about 25 feet per second. Considerable expert testimony is in the record in regard to the currents created by the siphons upon the water at varying distances from the intake. All agreed, however, that the siphons set up currents in the water similar to those described by defendants' witness Cochran, which were of such nature that "any objects moving in the current of course would be acted upon by the force of the current,"

Lay witnesses who saw the siphons in operation testified that upon the surface they could see the water swirl. Richard Carpenter, a boy playing near the dam, threw sticks and leaves into the water and watched them get into the swirl, be drawn down and up through the siphons and discharged at the other end. He stated that the swirl was sufficient to create a funnel-like hole in the water, which came and went; that a stick about a foot long would go through the pipe so you could see it come out at the other side of the dam. It seems that, perhaps due to the vagaries of the current feeding the siphons, at times the water at the surface would appear undisturbed, and at others the suction would become so great that objects would be drawn from the very surface with tremendous velocity down deep under the water and hurled at the rate of 25 feet per second through the pipes and out the exits some 27 feet down the stream.

The evidence disclosed that the casing of which the siphons were made had been cut, with a sharp instrument resembling a chisel, from the outside, in such manner that sharp steel projections some four inches long protruded inwardly about the periphery at the intake end.

On the occasion which gave rise to the case at bar, Frankie Peters, a 14-year-old girl, who had just graduated from the Sapulpa High School, went with a party of

girl friends to the pool to swim. Unmindful of the lurking danger, the girls swam about in the vicinity of the siphons, to the dam and back, until about ready to depart, when Frankie Peters swam between the pipes, to the dam, and lay with one hand resting upon it. Then she turned, started swimming, took one stroke, and disappeared. At the time she went down she was near the 12-inch pipe. Her head was directly over the north siphon (12-inch-pipe) when she went down. All the minor details, as revealed by witnesses, concerning her exact position and movements at the time she was drawn beneath the water and out of sight cannot be reconciled. However, none of the witnesses seemed to be in doubt concerning the basic facts in which we are interested. Henry Coe, a boy who was sitting on the bank watching them swim, immediately upon her disappearance said to a companion, "I believe that girl was sucked in that pipe, because she went under so fast," and the same witness described what happened. He said, "Then she was just sucked under." After a time bubbles rose.

Aid was summoned. When the ten-inch siphon was inspected it was found that her lifeless body was wedged into it to her hips, feet first, with one arm also drawn into the siphon. Efforts to dislodge the body with the siphon in place proved unavailing. The weight of the water, together with the barbed steel projections, held the body so firmly in place that it could not be dislodged.

Ultimately, with the assistance of the fire department, the siphons were taken out of the pool and the body recovered. Deep lacerations were apparent about the arms, legs, hips, and thighs, caused by the steel projections on the inner side of the pipe. There was a cut over one eye. All efforts at resuscitation failed.

The defendant E. G. Fike, agent and president of the E. G. Fike & Company, had personally supervised the installation of the siphons, and the deceased was drowned on the same day that the siphons were last installed.

The plaintiffs, the mother and father of the deceased, being appointed administrators of her estate, instituted suit to recover for the loss of her services and for pain and suffering which she sustained prior to her death.

The plaintiffs showed that the father was a cripple, 55 years of age, having one leg off and with a throat affliction making it exceedingly difficult for him to talk; that the deceased, Frankie Peters, was a girl of exceptional ability and scholastic attainments, in perfect health, industrious, a high school graduate at 14 years of age; that she was rated by her teachers as one of the most brilliant of students. She was first in debating, first in dramatic reading, an orator, and a distinguished scholar. She was also a capable solicitor of advertising for the school paper. Despite her youth, she had completed a course in typing, made her own clothes, and assisted with the housework, on occasions attending to the duties of a woman in the household without assistance. The evidence disclosed that she was a young woman with a future of maximum promise.

As to the question of conscious pain and suffering, no witness denied that the deceased did suffer conscious pain and suffering caused by her efforts to free herself from the suction that held her under the water and the wounds and lacerations resulting from contact with the wire barbs prior to her death. The duration of her agony was variously estimated at from two to six minutes.

The jury rendered a verdict for the plaintiffs, allowing them $10,000 actual damages upon their first cause of action and $5,000 for conscious pain and suffering upon the second cause of action. Upon motion for new trial, the trial court ordered a remittitur of $2,500 upon the second cause of action, which, being made, motion for new trial was overruled and the cause brought to this court on appeal.

The first proposition of defendants is:

"The action is based on inferences contrary to certain absolute physical laws, of which the court takes judicial notice, demonstrable by experiment, established by the evidence of experts, and wholly infallible."

We fail to agree. There is sufficient evidence in the record to the effect that the deceased was drowned by being sucked into one of the siphons. One witness testified that the deceased was sucked underneath the water by the siphon and that the "girl was sucked under in that pipe because she went under so fast." Other witnesses stated that she went under the water, rapidly, near the siphons. The facts clearly show that she was near the siphons when she went underneath the water and that she was drowned and her lifeless body taken out of one of the pipes. The jury heard the testimony of all of the witnesses in said cause, and as to this particular proposition its verdict should not be assailed, the evidence reasonably tending to support its findings. We

have repeatedly held that where there are conflicting theories of the opposing parties and each is reasonably supported by competent evidence, and such conflicting theories were submitted to the jury by appropriate instructions, the verdict of the jury will not be set aside on any assignment of error that the verdict is not supported by the evidence. Terrell v. State ex rel. Johnson, County Attorney, 134 Okla. 195, 272 P. 821; Oklahoma Natural Gas Co. v. Jopling, 121 Okla. 10, 247 P. 69.

Defendants' second and third propositions are closely related and can be discussed together. They contend that death by drowning is, legally and practically speaking, instantaneous, and that pain suffered after submersion and prior to unconsciousness is so intimately connected with the death-struggle as to form no proper distinct basis for damages; further, that the evidence was insufficient to sustain a verdict for conscious pain and suffering. The record shows that the body of the deceased was lodged in the ten-inch pipe, feet foremost, with one arm on the inside of the pipe and the other arm on the outside; that the pipe contained slivers which were sharp and with sharp bits of steel projecting that looked like fish gills. The testimony further showed that the body of deceased was lacerated by these sharp slivers and that it was necessary to press in the flesh and release the body from the sharp projections; that one wound on her thigh was four or five inches long and cut to the bone. Three physicians, testifying for plaintiffs, stated in substance that the deceased suffered a great deal of pain and shock for at least three to five minutes immediately prior to death.

There is a conflict in the authorities as to whether in a case of death by drowning there can be a recovery for conscious pain and suffering. This court has never before been called upon to pass upon this particular question. The weight of authority seems to hold that death by drowning is instantaneous and that pain suffered after submersion and prior to unconsciousness is so intimately connected with the death struggle as to form no proper distinct basis for damages. The Supreme Court of the United States has followed this view and in the case of Barton v. Brown, 145 U. S. 335, 36 L. Ed. 727, in a similar case, it was stated by the court as follows:

"Had she suffered bodily wounds and bruises, from the result of which she **lingered** and **ultimately** died, it is possible that her sufferings during her illness would give a separate cause of action; but the very fact that she died by drowning indicates that her sufferings must have been brief, and, in law, a mere incident to her death."

Also see St. L., I. M. & S. Ry. Co. v. Craft, 237 U. S. 648, 59 L. Ed. 1160; Kennedy v. Standard Sugar Refinery (Mass.) 28 Am. Rep. 214; Tulley v. Fitchburg R. Co., 134 Mass. 499; Cobia v. Ry. Co. (N. C.) 125 S. E. 18; Beach v. St. Joseph (Mich.) 158 N. W. 1045; Olivier v. Houghton County St. Ry. Co. (Mich.) 96 N. W. 434, 104 A. S. R. 607; Cheatham v. Red River Lines, 56 F. 248; Sherman v. Western States Company, 24 Iowa, 515.

In the case of Cheatham v. Red River Lines, supra, it was held that the struggle and suffering and pain of the drowning person are substantially contemporaneous with death and as a matter of law inseparable from it.

The other line of authorities holds there is no such thing in any case as death happening simultaneously with the injury causing it, and still less in cases of drowning, and that separate recovery for conscious pain and suffering is proper in such cases. This view has been adopted as the law in the states of Arkansas, New Hampshire, and several other states.

After reading the authorities pertaining to the above question we are of the opinion that death by drowning is so intimately connected with the death struggle as to form no proper distinct basis for damages. We therefore conclude that the damages of $5,000 rendered by the jury in this cause for conscious pain and suffering, and which said judgment was by the lower court reduced to $2,500, is contrary to law, and said cause should be reversed in so far as this particular item of damages is concerned.

The defendants' next proposition is as follows:

"The verdict of $2,000 for services during minority; of $8,000 for probable contributions after majority; and of $5,000 for conscious pain and suffering was excessive, inconsistent with the evidence, and indicative of passion and prejudice. The court's action in reducing the $5,000 to $2,500 is a finding to that effect."

We cannot say the verdict of $2,000 for services during minority and of $8,000 for probable contribution to her parents after majority was excessive. The facts disclose that the deceased was a very bright girl, who was an outstanding leader in her community and who had already begun to be

helpful to her parents in a financial way. That she was kind and helpful to her parents, plaintiffs herein, and that her father was crippled and in poor health, and without any earning capacity. The deceased, no doubt, would have felt obligated to contribute more financial aid to her parents after she reached the age of majority than she would had her father been an able-bodied man and able to assist his family in a financial manner.

The verdict can be sustained under the law as announced in Schaff v. Daugherty, 112 Okla. 124, 239 P. 922, in which this court stated:

"The amount of damages recoverable in a death case is always a question of fact for the jury, and the verdict of the jury will not be disturbed unless it appears from the record that the jury was swayed by passion or prejudice against the losing party, and unless the recovery is so large as to shock the sense of justice."

See, also, Schaff v. Daugherty, 112 Okla. 124, 239 P. 922; Ponca City v. Reed, 115 Okla. 166, 242 P. 164; Chicago, R. I. & P. Ry. Co. v. DeVore, 43 Okla. 534, 143 P. 864; Shawnee Gas & Electric Co. et al. v. Motesenbocker, 41 Okla. 454, 138 P. 790.

The case of City of Shawnee v. Cheek, 41 Okla. 227, 137 P. 724, laid down the rule that the value of services of a minor child during its minority is a question of fact for the jury to determine, and when the jury determines the question by a verdict, and there is any competent evidence to support it, the same wi'l not be reversed on appeal.

There is nothing in the record in this case to show prejudice or bias. Had the members of this jury been biased or acting under the heat of passion, they would perhaps have rendered a further verdict for exemplary damages as prayed for by plaintiffs. The verdict of $2,000 for services during minority and for $8,000 for probable contribution after majority should therefore stand.

The defendant further contends that incompetent and prejudicial testimony was admitted which was calculated to affect the verdict. We have read the record carefully and are of the opinion that even though some testimony may have been admitted which was technically inadmissible, it could not have affected the substantial rights of the defendant. It would be unusual in a case requiring such a voluminous record to not contain at least some evidence the admission of which would be questionable, but the record discloses that the trial judge appeared to be fair in his rulings on evidence, and we fail to find any evidence admitted over the objections of the defendants that would have prejudiced their rights or which might have changed the final result had such testimony been excluded.

The defendants further contend that the court erred in its instructions to the jury. The instructions complained of read as follows:

"You are instructed that from the very nature of a girl's services to her parents during her minority, it is impractical to state definitely in dollars and cents just what such services are worth; and in determining the value of such services, if any, you may bring to your aid your knowledge and experience of the nature and kind of services a girl generally renders and the probable value thereof to her parents; and in this connection you are instructed that the parents are entitled to the services and earnings of their children until they reach their majority; and in arriving at the net amount of such earnings, you will ascertain what such earnings or services were reasonably worth or would amount to; and from this sum you will deduct the reasonable charges and upkeep of said child, such as food, clothing, medical expenses, schooling, etc., and the value of the parents' services while rearing said child; and you may consider that with age, growth and experience the value of the child's services would increase, although you cannot consider that the child might, if not injured, engage in any particular calling. Should your verdict in this case be in favor of the plaintiffs on the first cause of action, the amount of your verdict should be the actual pecuniary loss which plaintiffs have sustained on account of the death of their said child, which will be the value of her services or earnings until she wou'd have reached her majority, that is, 18 years of age, less the expenses of her said up-keep and the value of her parents' services while rearing her as hereinabove mentioned; and if you should further find from a fair preponderance of the evidence that said parents are in a dependent condition and that the disposition of said child in its relation to said parents was such that there would be a reasonable expectation that said child would have contributed to the support of said parents after arrival at her majority, your verdict should also include in their favor such an amount as you find from a fair preponderance of the evidence there was a reasonable expectation that said child would have contributed to the support of said parents, after her arrival at her majority; the total amount, however, of your verdict for plaintiffs on the first cause of action if any, not to exceed the total amount sued for therein, to wit, $15,000."

"If you find and believe from a fair pre-

ponderance of the evidence before you that the defendants, E. G. Fike & Company and E. G. Fike, the latter being in charge thereof, installed and maintained the siphons in the city dam, in the manner and under the circumstances detailed in the evidence, and that the said siphons, in the condition in which they were installed and maintained therein, caused a suction of the water that was dangerous to the lives of those who might be using the same, and that under all the facts and circumstances in evidence before you, such acts on the part of said defendants were careless and negligent and that on the 26th day of June, 1929, the deceased, Frankie Peters, while swimming in said water and while in the exercise of ordinary care for her own safety, was caught in the suction at the mouth of said siphons or either of them and by reason of the force thereof was submerged under the surface of said water and a portion of her body was drawn into the mouth of either of said siphons and held fast until she lost her life, and that her death was the direct and proximate result of such acts or either of such acts of carelessness and negligence on the part of said defendants, then your verdict should be in favor of plaintiffs on their first cause of action herein; but if you should not so find and believe from a fair preponderance of the evidence, then your verdict should be in favor of the defendants herein."

The above instructions are supported by Shawnee Gas & Electric Co. v. Motesenbocker, 41 Okla. 454, 138 P. 790, and the case of Weleetka Cotton Oil Co. v. Brookshire, 65 Okla. 293, 166 P. 408.

The case of Adams v. Small, 151 Okla. 244, 3 P. (2d) 661, holds:

"Instructions of the court that with reasonable clarity state the substantive law of the case under all the ultimate facts shown by the evidence are sufficient."

It is well settled in this state that to be a ground for reversal on appeal, any error complained of must be a prejudicial error and not a mere academic misstatement on some immaterial proposition.

We have examined the complete record, including all instructions given, and those requested which were not given, and find the instructions, taken as a whole, properly cover the law and the facts in this case, and find that no prejudicial error is contained in the instructions, except as to the proposition hereinbefore discussed relative to damages obtainable for conscious pain and suffering incident to death by drowning. Therefore, it is unnecessary to set forth the latter instruction in this opinion.

Defendants next contend that counsel for plaintiffs were guilty of prejudicial misconduct (a) by deliberately bringing to the jury's attention the fact that the defendants were protected by insurance; (b) by improper and inflammatory closing argument.

The question relied upon as being objectionable was asked by counsel for plaintiffs of Dr. Croank, witness for defendants, as follows:

"Doctor, are you employed by any casualty insurance carriers?"

This question was objected to and unanswered and the jury instructed to pay no attention to it. The other question propounded was:

"Who engaged you to come here?"

These questions above referred to are not of a sufficient nature to bring this case within the rule of Yoast v. Sims, 122 Okla. 200, 253 P. 504. In the Yoast Case, after the jury had been impaneled and sworn, counsel for plaintiff in his opening statement to the jury, among other things, said:

"Mr. Yoast told him that he carried insurance on all of his employees, so that if any of these employees were injured or killed. why, they would be taken care of amply."

The Yoast Case holds that no reference should be made as to whether or not the defendant carried insurance, and if such references are made, it is a reversible error although the trial court instructs the jury not to consider the same. Several references were made in the Yoast Case relative to the defendants having insurance or being protected by insurance companies.

We decide here that the questions asked in the present case are not sufficient to place this case under the law and facts applicable to that case.

We feel that the law applicable to the question in the present case relative to insurance brings this case within the rule laid down in the cases of Aderhold v. Bishop, 94 Okla. 203, 221 P. 752, and Letcher v. Skiver, 99 Okla. 269, 226 P. 1029.

56 A. L. R. 1485, states there is no hard and fast rule on the subject but that:

"If the plaintiff gets this matter into the case by questionable practice, the court upon proper application should penalize him by directing a mistrial. And if he deliberately sets out, though in an indirect way, to inform the jury by improper evidence or arguments that the loss, if any, will fall upon an insurance company, his conduct is deemed so prejudicial as to warrant a re-

versal of the judgment, if for the plaintiff, and the granting of a new trial; at least, where the evidence is conflicting, and the case is a close one on its facts."

In the present case we cannot say that counsel in asking said questions was guilty of improper motives, and we fail to find that counsel's conduct in asking said questions could be prejudicial at all, especially to the extent that it would warrant a reversal of this case.

We also fail to agree that counsel for plaintiffs in his closing argument made statements that would be so prejudicial to the rights of the defendants as to justify a reversal of this cause, and deem it unnecessary to discuss the contention further.

The judgment is reversed as to the amount allowed by the jury for conscious pain and suffering, and remanded with instructions to dismiss as to this cause of action. The judgment is affirmed in the sum of $10,000 on the first cause of action. At the request of plaintiffs, judgment in the sum of $10,000 is hereby rendered against the Southern Surety Company of New York by reason of said company being the surety on the supersedeas bond herein.

The Supreme Court acknowledges the aid of Attorneys Denver N. Davison and L. H. Harrell in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Davison and approved by Mr. Harrell, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, the opinion, as modified, was adopted.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BAYLESS, BUSBY, PHELPS, and CORN, JJ., concur.

WELCH and GIBSON, JJ., dissent.