J. C. PENNEY COMPANY, a Corporation,
and Charles Truhitte, Plain-
tiffs in Error,

v.

Mary BARRIENTEZ, Defendant in Error.

No. 40724.

Supreme Court of Oklahoma.

Oct. 26, 1965.

Rehearing Denied Jan. 4, 1966.

Monnet, Hayes, Bullis, Grubb & Thompson, by Glen H. Grubb, Oklahoma City, for plaintiffs in error.

Lampkin, Wolfe & Blankenship, by Raymond Burger, Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

·This is an appeal in one of a category of cases now commonly called "slip and fall"

cases. The fall in this case occurred about 7:00 P.M., on October 6th, 1960, when defendant in error (hereinafter referred to as plaintiff) while walking down the stairway between the street floor, or "street-level" floor, and the second floor of the department store then operated by the J. C. Penney Company, and managed by Charles Truhitte (hereinafter referred to by surname and/or as defendants) at 303 West Main Street, in Oklahoma City, slipped and fell, incurring bodily injuries.

At the trial, plaintiff testified, in substance, that the cause of her fall was her left foot slipping out from under her when stepping on a small, hard, round object on one of the stairs. She further testified that she didn't know whether the object was a marble, or a piece of candy, but it felt and looked like a marble; and, that after she slipped, she heard this round, ball-like, object rolling down the remaining steps (6 or 7) to the stairway landing. She further testified that she did not see the object before her fall, but that a man, who came up the steps from the store's street floor, and later took charge of completing her shopping for her (while she was reclining in the store's lounge) picked up the object and said it was brown candy, but wouldn't let her have it. The object was not produced at the trial, but the store's manager, Truhitte, while testifying as a witness for defendants, after identifying himself as the man who completed plaintiff's shopping for her, denied he ever saw, or handled, any object such as the one plaintiff claims to have caused her fall, and, in effect, disclaimed any personal knowledge of the cause of the accident.

While describing what occurred after her fall, plaintiff testified, on cross-examination, concerning a contact she had with a woman, who was identified by other evidence as Wilma Mae Peek, Truhitte's secretary, as follows:

"She took my name and address and she said if I needed to go to a doctor, well, I would, and they would pay for it, that they had *insurance* for that and they would pay for it, for me to go, and then when my husband came up, well, he told them that he was going to take me and asked them was there any doctor that they—any special doctor, that they wanted him to take me to, and they said, 'No, just take her to any doctor.'" (Emphasis added.)

Defense counsel thereupon moved for a mistrial on the ground that plaintiff had voluntarily injected "insurance" into the trial, but this motion was overruled and exceptions allowed.

Before the close of plaintiff's testimony, in which it had been established, among other things, that she was a married woman living with her husband, she offered in evidence, in support of her alleged damages, unpaid bills she had received from her doctor, as well as her hospital. Defendants objected on the ground, in substance, that these bills represented obligations of plaintiff's husband, rather than of hers, and therefore were not proper items of damages in an action like this, in which she was the sole plaintiff.

Before all of plaintiff's evidence was in, her counsel read into the record portions of a deposition previously taken from manager Truhitte. Defense counsel moved that this evidence be stricken, maintaining it was not binding on his employer, the Penney Company. When plaintiff's counsel represented that he was offering the deposition portions against both of said defendants, the motion to strike was overruled.

At the close of plaintiff's evidence, defendants separately demurred to it. These demurrers were overruled, and, after both sides had rested, defendants separately moved for directed verdicts. These, likewise, were overruled. After the trial court submitted the case to the jury, a verdict was returned for plaintiff in the sum of $2500.00, and judgment was entered accordingly. After the overruling of defendants' motion for a new trial, they perfected the present appeal.

Defendants' various assignments of error are incorporated in their briefs as 11 propo-

sitions, but, for the purpose of their argument, they have combined some of them.

Under their Propositions 3, 4, 8, 9, 10, and 2 (in so far as the latter relates to the Penney Company) defense counsel, with apparent reference to the trial court's alleged errors in overruling their motions for directed verdicts, argue that there was no evidence of negligence on the part of either defendant. They call our attention particularly to the absence of any evidence showing how the marble, or candy ball, happened to be on the stairway, or how long it had been there when plaintiff stepped on it.

It was established that the Penney store does not sell marbles or candy; and there was no evidence to suggest that the involved object was placed there by either of the defendants, or any of their associates or employees. When interrogated about the matter, plaintiff testified specifically that she did not see that object when she ascended the stairway to shop on the store's second floor 30 minutes before the accident, but she insisted that she did see cigarette butts and pieces of paper strewn the full length of the stairway. She was positive, however, that it was neither of these that caused her fall. Her testimony, as to the stairway being littered with cigarette butts and paper, was contradicted to the extent hereinafter shown.

Manager Truhitte testified, among other things, in substance, that the day of the accident was Thursday, one of the two days each week when the Penney store stayed open continuously from 9:30 A.M., to 8:30 P.M. As to the Store's "housekeeping", he deposed that a Penney employee, named Van Blackburn, who the witness referred to as the "Building Maintenance Manager" was directly responsible to the store's assistant manager, and was in charge of floor cleaning in the store. He further testified that, on the date of the accident, the store's cleaning crew consisted of a maid, Lena Reed, and a janitor named Robert Forney. Truhitte further testified that Forney was no longer in Penney's employ, and was "said to be in California." He stated that

Lena Reed was still working at the store. (She did not testify). As to cleaning practices in the store, Truhitte testified that prior to its opening each day, the store was cleaned completely " . . . and the maid does detail pickup on the lounges and the stairways about three additional times a day, at about 11:00 o'clock in the morning, about 3:00 o'clock in the afternoon and about whatever her checkup time is, 4:30 or 5:00 in the evening." Truhitte further testified that the maid and janitor work independently of each other and that the maid's schedule of work is controlled by the assistant manager, to whom she is directly responsible. He further testified that the maid is the only Penney employee having the direct and individual responsibility of cleaning the subject stairway during the day. As to the two days each week that the store was open until 8:30 P.M., Manager Truhitte's cross examination reads as follows:

"Q What arrangements did you have, or have you made, to have some person take on her responsibility of cleaning those steps when you are open late from five until 8:30?

"A On the two nights that we are open late, the janitor ordinarily would be in the store from 5 until 8:30, or 5 until 8, and he would make an inspection of the store area as he put out supplies. He is responsible for putting out bags and boxes and supplies on each floor and, of course, in doing that he would have been on the stairs, and each management man and myself are charged with the responsibility of constantly looking for anything that might be detrimental to the store, as we are about our business in the store.

"Q Of course, that is the type of duty that each of the employees knows that he has, but, by the same token, each employee knows that all other 20 or 30 or 40 or 50 or 60 or 80 employees has the same duty and obligation?

"A This is true, but the managing staff particularly is charged with this

and are accountable for it. This would include some ten or twelve people.

"Q That is opposed to the maid whose direct responsibility it is to do this physical work of cleaning up?

"A That is right.

"Q And you have no person, after the maid goes off at 5 o'clock, to have the immediate singular responsibility of cleaning those stairs, do you?

"A Except the janitor, if he is in the store.

"Q But that is just an if proposition, if he happens to be going about those stairs and if he saw the condition and if he didn't have something else to do that was more pressing. He had the authority to do it, so to speak?

"A He would have checked the stairs as a part of his responsibility at least once in the evening.

"Q As a routine matter, he would inspect the stairs?

"A Yes, he would at least one time between the time she left and the time the store closed. He would have been charged with that responsibility.

"Q Do you know what time from 5 o'clock until 8:30 that would have transpired?

"A No, I don't.

"Q Would you say that it would probably have been around 7 or 7:30?

"A It could be any time between 6 and 8:30, I would say.

"Q And so it is just possible that when Mrs. Barrientez fell, this could have been immediately before he should have inspected these stairs?

"A That is possible."

Truhitte's deposition, taken in April, 1962, and introduced in evidence at the trial (approximately a year later) contains, among other things, the following questions and answers concerning the janitor:

"Q And when you are open evenings, what are his hours?

"A They vary. Sometimes he's there in the evening and sometimes he is not.

"Q Do you know whether he was there on October 6, 1960?

"A No, I don't. * * *."

Also, in that deposition, Truhitte estimated that the number of customers who entered and left the store on one of the days it was open from 9:30 A.M., to 8:30 P.M., was "around a thousand." In the testimony he gave at the trial, he further stated:

" * * * Ordinarily, we will have more customers in the store on a night * * * between 7:30 and 8:30 than we would have at any other time. The total number of customers that we would have had between 5:30 and 8:30 would be somewhere in the neighborhood of one hundred. * * *."

Truhitte also testified that, of the store's 70 to 80 employees, only 20 to 25 were on duty at the time of the subject accident. He also testified that all of the store's managerial staff is responsible for keeping the store "clean, orderly and neat, at all times during the hours the store is open, and this includes picking up anything they find on the floor or in any area they might be in in the store, paper, sales tickets or anything that might accumulate." Truhitte also testified that the work of division managers, such as Robert Mitchell, manager of the second floor, requires them to be "in various areas of the store besides their assigned areas" and that Mitchell "would have occasion" to be on all of the store's floors "several times in the course of the day." Mitchell corroborated this, testifying that Penney's "floor" men "worked between floors with the other men in planning all of their promotions and we have occasion to go up and down the stairs all the time."

Mitchell further testified that, on the evening of the accident, he had gone out of the store to dinner about 6:00 P.M., and had returned and gone up the stairs to his

post on the second floor "around 5 minutes to seven." He further testified that there was nothing on the stairs at that time, and added that, if there had been, he would have picked it up. He also testified that it was 10 or 15 minutes after this that he first saw plaintiff. He denied that he ever saw, or had in his hand, a marble or any such object that he showed plaintiff; and, upon being asked when it was that he first learned "that some marble or piece of candy, or some other object was supposed to have caused her fall", he replied that it was "about a year ago", when the case was (first) scheduled for trial.

Truhitte, in addition to the testimony already shown also testified, among other things, in substance, that as soon as he was told that the woman, he later learned was the plaintiff, had fallen on the stairway, he left his desk in the store's general offices on the second floor, and, accompanied by his secretary, Mrs. Peek, walked to the stairway and down it to the step (near the landing) on which plaintiff was sitting. In relating his conversation with plaintiff, Truhitte testified:

"* * * I again asked her what she fell on and she said 'Something round' and I asked her if she saw the object and she said she did not.

"* * * I surveyed the area in the vicinity of the fall, which included the step that she was on and the steps around that area, and the landing and I found nothing. Mrs. Barrientez said that she thought she heard something roll down the stairs after she slipped. I went from the landing down to the street floor and looked in that area to see if it could have fallen off the stairs, and I found nothing that she could have fallen on."

Other portions of Truhitte's testimony were as follows:

"Q Now, when you are working at the store, how do you go from one floor to another?

"A Well, I am usually in a hurry and I usually take the stairway. I would say that 95% of the time I take the stairway.

* * * * * *

"Q Had you been up and down that stairway that evening before 7:00 o'clock?

"A Well, somewhere in the course of the evening, I had been up and down the stairway. * * *

* * * * * *

"In the natural course of my business, I could have been up and down the stairs many times or I could have been up and down it once or twice. I couldn't say how many times I had actually been up and down the stairway.

"Q Now, after you first learned that Mrs. Barrientez had fallen, how many times then did you go up and down or inspect these steps to see if you could find anything on the steps or find what caused her fall?

"A Well, I inspected the area at the time I came on the scene and I inspected the steps from the area of the fall to the other floor at that time, and then I again inspected the steps from the second floor all the way to the basement at the time I went down to make her purchase for her, and I did the same upon my return from having made this purchase, and then when I left the store somewhere around 7:30, I walked the stairs again from the second floor to the street floor and if you manage a store awhile, the natural thing that you will do is to walk the stairways to see if there is any foreign object or anything that has been left on there for any reason, and it is just second nature for a merchant to do that.

"Q Now, did you, on any of these occasions see any cigarette butts on the stairway or any place around there?

"A No, *I did not see* any cigarette butts.

"Q Did you see any paper or any foreign objects?

"A *I was not conscious of any* paper in the area. *I wouldn't say that there could not have been some,* but there was no sack, there was no bag, there was no box, there was no round hard object.

"Q You were looking for some such object which might have caused her fall?

"A This is right, yes, sir. * * *." (Emphasis added.)

██ As above indicated, plaintiff's testimony to the effect that it was a small, round, hard object resembling a marble that caused her fall on the stairway of Penney's store, stands virtually alone, being without corroboration from any other witness. However, it was neither inherently implausible, nor contrary to the physical facts, and the jury was within the bounds of its prerogative (to say the least) in believing it and conforming its verdict thereto. In this connection, see Borden v. Day, 197 Okl. 110, 113, 168 P.2d 646, 649. Notice also Hubbard Banking Co. v. Koetsch, 105 Okl. 227, 231 P. 207. It must be recognized, however, as defendants point out, that there was no direct evidence as to how long this object was on the stairway before plaintiff stepped on it, and defendants contend, in effect, that this "void" in the evidence is fatal to plaintiff's case, and should have been recognized as such by the trial court in ruling on their motions for directed verdicts. In this connection notice Whitehead v. Erle P. Halliburton Co., 190 Okl. 120, 121 P.2d 581. The theory is that defendants cannot be held negligent in the absence of evidence showing that they knew, or should have known, of the object's presence there, long enough before the accident, to have enabled them, in the exercise of reasonable or ordinary care, to have removed it, or otherwise protected plaintiff against suffering injury because of it. The opinions of this court cited in support of their theory are: Safeway Stores, Inc. v. Freeback, Okl., 390 P.2d 519, Safeway Stores, Inc. v. Criner, Okl., 380 P.2d 712, J. C. Penney Co. v. Johnson, Okl., 364 P.2d 1111, and Tweed v. First Nat'l Bldg., Corp., 203 Okl. 31, 218 P.2d 356. In our opinion, all of these cases are distinguishable from the present one. In the J. C. Penney Company Case, there was no evidence that a pencil, alleged to have been dropped by one of the defendants' agents, was involved in any way in her fall. In the Tweed Case, we affirmed the trial court's sustaining of defendants' demurrers to plaintiff's evidence on the ground that plaintiff's slip and fall on a stairway in Oklahoma City's First National Building was not sufficiently proved to have been caused by a slippery condition shown to have existed *previous* to the plaintiff's fall. In neither of the other cited cases was there evidence from which it might reasonably have been concluded that the defendants knew, or should have known, that a dangerous condition existed in its store, before the happening of the accidents involved therein. In the present case, unlike the slippery conditions in those cases, if plaintiff's testimony is to be believed (its contradiction by defendants' witnesses differed, as hereinbefore noted, in their degree of unequivocalness) it may be inferred that virtually the same littered condition of the involved stairway existed at least 30 minutes before her fall, that existed at the moment of it. Of course (as already indicated in our description of plaintiff's testimony) the cigarette butts and pieces of paper, the only "testified-to" (and presumably the only obvious) portions of this debris, or litter, did not cause plaintiff's fall; but the question is: Should the presence of such litter on the stairway have forewarned, or furnished notice, of the existence of a dangerous condition on it, to the Penney Store's employees whose duties included concern with foreign objects and dangerous conditions on the store's floors and/or stairways? Disregarding the evidence as to whether the Penney Company had any of its janitorial crew on duty at the store after 5:00 P.M. on the nights it stayed open until 8:30 P.M., and aside from whether or not one of the issues for the jury was whether failure to do so would constitute a "careless general practice", which could have rendered it

liable for the consequences of the plaintiff's fall (see the discussion in Mahoney v. J. C. Penney Co., 71 N.M. 244, 377 P.2d 663, 671–674) and assuming that it was necessary (in view of the record as a whole) for plaintiff to introduce evidence tending to show constructive notice to defendants of the presence on the stairway, before the accident, of the foreign object 'which caused it (in this connection notice Bozza v. Vornado, Inc., 42 N.J. 355, 200 A.2d 777) we believe the evidence in this case was sufficient for that purpose. As stated in Bridgman v. Safeway Stores, Inc., 53 Cal.2d 443, 348 P.2d 696, 697:

> "* * * It is the general rule that the proprietor of a store who knows of, or by the exercise of reasonable care, could discover an artificial condition upon his premises which he should foresee exposes his business visitors to an unreasonable risk, and who has no basis for believing that they will discover the condition or realize the risk involved, is under a duty to exercise ordinary care either to make the condition reasonably safe for their use or to give a warning adequate to enable them to avoid the harm. * * *."

If the above rule is applied to the present case, the accumulation of cigarette butts and pieces of paper (and, in reasonable contemplation, other less obvious "foreign" objects dropped by its invitees) on the Penney Store's stairway, must be regarded as "an artificial condition"; and—while the particular named kind of litter (cigarette butts and paper) did not cause plaintiff's fall— we think the existence of that sort of condition, if the Penney Company's employees hereinbefore referred to, saw, or in the exercise of reasonable care and attention to their duties, should have seen it, was sufficient to warrant submitting this case to the jury on the question of whether defendants had notice (actual or constructive) of a dangerous condition on the stairway, in sufficient time before plaintiff's accident, to have removed such hazard. It was for the jury to decide whether reasonably prudent

employees, "standing in their shoes", would have anticipated that there might be hidden among such litter, or, at least, not obvious to the ordinary invitee-customer using such stairway, a small, round object like the one plaintiff testified she slipped on. Though the perceptible litter (cigarette butts and pieces of paper) may not have been dangerous to customers of the store, if an inspection of it might have revealed more dangerous objects, such as the subject one, interspersed among, and perhaps hidden by, it, then the litter was sufficient for the purpose of notice. The Penney Company's duty was not limited to conditions known to be dangerous, but extended to those which, by the exercise of reasonable care, might have been found dangerous. Goldsmith v. Mills, 130 Cal.App.2d 493, 279 P.2d 51, 52. If, on the basis of the evidence, the jurors believed that the litter was sufficient to give defendants notice of the condition on the stairway, and that said condition was foreseeably dangerous, then there was no obstacle in any of the evidence, to a conclusion by them that both of the aforenamed employees had ample opportunity to observe it (even though they denied seeing it) in ample time to have warned plaintiff, or to have taken sufficient precautionary measures to have prevented her fall. See Hunter v. Mohawk Pet. Corp., Cal.App., 322 P.2d 551, 554, 555. There 'was no such evidence in Whitehead v. Erle P. Halliburton Co., supra.

 Though there is no direct evidence that this condition existed more than 30 minutes before plaintiff's fall (as indicated by her testimony) this also was no reason for not submitting the case to the jury on the issue of defendants' negligence. What constitutes a reasonable time such a condition may exist before a store owner may be held negligent for failure to discover, and remove, it, or warn his customers of it—like the length of time neglect to inspect may continue without furnishing the basis for an inference of constructive notice—depends upon the facts of each case. See Presnell v. Safeway Stores, Inc., 60 Wash.2d 671, 374 P.2d 939, 941, Hubbard

v. Montgomery Ward & Co., 221 Minn. 133, 21 N.W.2d 229, 231, Bridgman v. Safeway Stores, Inc., supra (348 P.2d p. 698), Ratering v. Mele, 11 N.J.Supp. 211, 78 A.2d 105, 107, and other cases cited in the annotations at 61 A.L.R.2d 174, 182 ff and 6, 43 ff. Where reasonable minds may differ in their inferences and conclusions therefrom, the question, like the broader issue of whether defendants have performed their duty should be left to the jury. See Christianson v. Kramer, 255 Iowa 239, 122 N.W.2d 283, 287. For the foregoing reasons, we hold that, on the basis of the evidence introduced, the trial court committed no error in overruling the motion of the defendant, J. C. Penney Company, for a directed verdict.

 With obvious reference to the trial court's alleged error in overruling Manager Truhitte's motion for a directed verdict, defendants, under their combined Propositions 1, 2, 4, 8 and 10, contend, in substance, that the evidence established no liability against him because it showed no breach of any duty he owed plaintiff. They argue that Truhitte's failure to discover, and remove from the stairway, the "foreign" object on which plaintiff testified she slipped, or to warn her of its presence there, were merely acts of nonfeasance or breaches of duty he may have owed his employer, the Penney Company, but that, in Oklahoma, such non-action on his part could not be the basis of any liability to a third person, like plaintiff. They cite the cases of Chicago, R. I. & P. Ry. Co. v. Witt, 144 Okl. 246, 291 P. 59, Davis v. St. Louis, S. F. Ry. Co., D.C., 8 F.Supp. 519, Morefield v. Ozark Pipe Line Corp., 8 Cir., 27 F.2d 890, Hane v. Mid-Continent Pet. Corp., 10 Cir., 43 F.2d 406, and Scott v. Huffman, 10 Cir., 237 F.2d 396, in support of their position. All of these cases are distinguishable from the present one, where, on the basis of the evidence, Truhitte both undertook to discharge the duty his employer, Penney Company, owed its invitees, and was the custodian of the store's premises, or, in so far as such business invitees as plaintiff were concerned, was in charge of the store.

We think that, on either of these bases, his liability to plaintiff, under the facts of this case, would be the same as, or equal to, that of his employer—the "possessor" of the premises. In this connection see American Law Institute, Restatement of The Law, Agency 2d, secs. 354 and 355. Under the last cited section, an agent, who has the custody of property and who should realize there is an undue risk that its condition will cause harm to the person of others, is subject to liability for such harm during the continuance of his custody, by his failure to use care to take such reasonable precautions as he is authorized to take. In comment "a" to sec. 354, supra, it is said:

"* * * If the work given the agent is for the protection of others, and the agent does not perform it, under ordinary circumstances the others do not receive the protection from the principal which otherwise they would have received. If such protection is essential to the safety of such others and the agent at the time he undertakes to act should realize this, his intervention into relations between the principal and the others by his assumption of the duty to the principal creates a duty to the others to use care either to perform the service or to see that no harm results from his failure to do so. * *."

In Coffer v. Bradshaw, 46 Ga.App. 143, 167 S.E. 119, 122, the court, in speaking of such an agent, said:

"* * *

"When once he enters upon the performance of his contract with his principal, and in doing so omits, or fails to take reasonable care in the commission of, some act which he should do in its performance, whereby some third person is injured, he is responsible therefor *to the same extent as if he had committed the wrong in his own behalf*.

* * * * * *

"While the owner *or person in charge of* property is not an insurer of the safety of the invitee thereon (case cita-

tion) he owes to the invitee the duty of exercising reasonable or ordinary care for his safety (citing cases), and is liable for injury resulting from a breach of such duty. Bass v. Southern Enterprises, Inc., supra. The duty in this respect is an active, affirmative, or positive one, and is not limited to merely refraining from injurious acts, although there is also a duty to refrain from any act which may make the invitee's use of the premises dangerous or may result in injury to him. 45 C.J. 825. There is a duty of protection against injury through the negligent acts of the owner or his employees. Moone v. Smith, supra. The owner or *person in charge* of the premises owes to invitees thereon the duty of keeping the premises in a reasonably safe and suitable condition, so that those invited to enter thereon shall not be unnecessarily or unreasonably exposed to danger, and is therefore liable for injuries received by invitees as a result of a dangerous condition on the premises (citing cases).

 \* \* \* \* \* \*

A corporation is an artificial person and can only act through its directors, officers, agents, and servants. The oil mill of the defendant corporation *was in complete charge of the demurrants.* They constituted its *managing agents* of that plant. The tortious agent and the corporation for whom he is acting when the tort is committed can be sued in the same action jointly. (Citing cases). \* \* \*." (Emphasis added.)

See Atlantic Coast Line R. Co. v. Knight, 48 Ga.App. 53, 171 S.E. 919, to the same effect. In Rising v. Ferris, 216 Ill.App. 252, 258, the court quoted from another Illinois case, in part, as follows: " 'He [the agent] cannot, in all cases, find shelter behind his principal' "; and incorporated in its opinion a quotation from Mechem on

Agency (2nd Ed., sec. 1474) which is in part, as follows:

" 'The agent should be held responsible for injuries caused by the condition of premises in the possession or under the control of the agent where the condition is one for which he is responsible and the injury is such as he would be liable for if he were controlling the premises on his own account. \* \* \*.' "

After stating the converse of the above (where the agent is not in control or has neither the duty, nor the power, to remedy the condition) this Agency text continues:

" \* \* \*

" 'But where these conditions are present it is difficult to see why it is not properly to be regarded as his act. It is, of course, in one sense a not-doing, a nonfeasance; but his act of control is a doing, a feasance, and his failure to properly control is a misfeasance, *if any importance is to be attached to these terms.* It would seem to need no argument to show that the mere not-doing of a particular act which is in itself but a mere incident in the larger act of doing, ought not to be regarded as such a nonfeasance as will excuse the agent within any proper meaning of that term. \* \* \*.' " (Emphasis added.)

In the quoted case, the court noted more than once that the individual defendant, as manager of the Theatre involved, had "general control" over it, and its operation. In Mississippi Power & Light Co. v. Smith, 169 Miss. 447, 153 So. 376, 379, 380, after reviewing various cases pertaining to an agent's liability for nonfeasance and misfeasance, stated:

" \* \* \* the modern rule tends to abolish the distinction between the agent's acts of commission and omission wherever such act involves a breach of duty. (Citing authorities)."

Other discussions of the subject may be found by referring to Hagerty v. Montana

Ore Purchasing Co., 38 Mont. 69, 98 P. 643, 25 L.R.A.,N.S., 356, and the following annotations: 99 A.L.R. 408, 49 A.L.R. 521, 20 A.L.R. 97; and 35 Am.Jur., "Master & Servant", secs. 584–588. (While we do not subscribe to all that the courts said in the cited cases, and, clearly some of their statements are unsound and almost as confusing as the "legal jugglery" referred to in the Hagerty case, supra, we think the principles referred to in the foregoing quotations are sound, and should be consistently adhered to in this jurisdiction. Therefore, to the extent that any previous opinion of this Court is contrary to this one, it is hereby overruled and/or modified). This court applied the principles we now advocate, without naming them, in Covington Coal Products Co. v. Stogner, 181 Okl. 35, 72 P.2d 491, and without mentioning, or distinguishing that case from Chicago, R. I. & P. Ry. Co. v. Witt, supra. That portion of the court's opinion in the last cited case concerning "nonfeasance" was dictum, and unnecessary to the decision therein. It is unfortunate if failure to recognize this misled the late Judge Kennamer in the Davis Case, and Judge Phillips in the Scott Case, both supra. This is not to say, however, that any of the afore-cited opinions referred to by defendants reached incorrect results. They are all different from the present case in that in them it was not established that the individual defendants were in control, or active charge, of the particular sphere of activity complained of by the respective plaintiffs therein, as the source, or cause, of their injuries. Here, there is no question but that Truhitte, as the Penney Company's manager, was the one of the store's personnel who, ultimately, was responsible for the protection of its customers, or business invitees, against harmful, and temporary, but dangerous, conditions in the store, such as the one involved here. At least, that is a fair inference from testimony Truhitte gave at the trial, and none of defendants' arguments directly challenge his ultimate responsibility and overall duty and power, as respects this phase of the store's management. To

plaintiff, and others like her, Truhitte *was* the J. C. Penney Company, or its local representative, or substitute. See Baird v. Shipman, 132 Ill. 16, 20, 23 N.E. 384, 7 L.R.A. 128, 129, 22 Am.St.Rep. 504, 506. See also the excellent discussion in Adams v. Fidelity and Casualty Co. of New York, La.App., 107 So.2d 496. We think the evidence in this case, and the reasonable inferences that might have been drawn therefrom, such, that the jury would not have gone beyond its prerogative in concluding that Truhitte was a "supervisor" of customer-hazardous "housekeeping" in the Penney Store. In this connection, notice the statement preceding footnote 15, page 1025 of Vol. 13, American Jurisprudence. It follows from the foregoing that defendants' presentation demonstrates no error in the overruling of Truhitte's motion for a directed verdict; and we so hold.

■ Under defendants' Propositions No. 6 and 11 (which they argue together) they contend that the verdict and judgment are excessive in the total amount of plaintiff's hospital and doctor bills. They take the position that the trial court should have sustained their objection to the introduction in evidence of those bills (and also erred in instructing the jury that such evidence could be considered in determining the total amount of plaintiff's damages) because they had not been paid. According to defendants' interpretation of the evidence, and of the decisions they cite, plaintiff is not legally obligated to pay them, but, instead, they are the legal obligations of her husband. We do not agree. We think that under either St. Louis-S. F. Ry. Co. v. Loftus, 109 Okl. 141, 234 P. 607 and Palacine Oil Co. v. Philpot, 144 Okl. 123, 289 P. 281, relied upon by defendants, or Dunn v. Southall, Okl., 373 P.2d 35, relied upon by plaintiff, the evidence was sufficient for these bills to be included in the jury's consideration of plaintiff's damages. We do not think the portion of plaintiff's testimony cited by defendants to the effect that her "husband had to sign before" she could "get out" of the hospital means that

said hospital is holding Mr. Barrientez primarily responsible for the payment of its bill. (In connection with defendant's argument, see Security Nat. Bank v. Johnson, 195 Okl. 107, 155 P.2d 249, 169 A.L.R. 790). That this is correct, we think is made quite evident by the fact that the bills themselves (as portrayed by copies in the record) were made out to plaintiff only, that she (as well as her husband) "signed", both when she entered, and when she left, the hospital, the undisputed evidence that plaintiff works and has earnings of her own, and by the following excerpt from plaintiff's re-direct examination:

"Q When you presented yourself to the hospital, Mary, and, to the doctors, there was, I am assuming some conversation about who was to pay these bills that you incurred?

"A. Yes.

"Q What arrangements did you make with the hospital and the doctors to pay these bills?

"A That I would pay them when I started back to work.

"Q From what money?

"A Money that I made. * * *."

During her direct examination, plaintiff testified that she had made (advance) arrangements with the doctor for the payment of his bill, and further testified that she would "have to pay" the hospital bill. The evidence is undisputed that plaintiff went back to work 10 months after the accident involved here, and that, at the time of the trial, she was working six days per week for a janitor service. In rejecting an argument similar to defendants' that was advanced in the Dunn Case, supra, we held:

"It is the duty of the husband to make sufficient provision for his wife, including a residence in which to live, according to his ability and their station in life; *but this fact does not prevent the wife from becoming personally liable for such provision where she contracts with a third party for same and agrees to pay therefor.*" (Emphasis added.)

While, according to the facts of the quoted case, the defendant there was not living with her husband, that fact, under that holding, is not controlling. On the basis of the foregoing, we hold that the trial court committed no error in admitting the bills in question and authorizing the jury (by its Instruction No. 14) to consider such evidence in determining the amount of plaintiff's damages. It also follows that the verdict and judgment were not rendered "excessive" by such consideration.

■ Under their Proposition 5, defendants contend that the trial court erred in refusing to declare a mistrial because plaintiff had mentioned "insurance" in her testimony on cross examination, as hereinbefore shown. Plaintiff's counsel says she was referring to "medical" insurance, rather than to "liability" insurance, and cite Black Gold Petroleum Co. v. Webb, 186 Okl. 584, 99 P.2d 868, wherein this court held that the reference by plaintiff's counsel and a witness, to workmen's compensation insurance "was not such a reference to insurance as would be prejudicial to defendants' rights in the mind of the jury." There is nothing in the record before us to make it appear that the testimony complained of did not refer to public liability insurance, or a type of insurance that would indemnify Penney and Company against having to pay the medical bills of the members of the public injured in its store—either before, or after, being reduced to judgment; and we cannot say, as was said in the Black Gold Petroleum Company Case, supra: "The declarations of counsel and witness here complained of *clearly did not refer to that character of insurance held to be unmentionable* in such case." (Emphasis added). In the recent case of Pratt v. Womack, Okl., 359 P.2d 223, the word plaintiff's husband used was "compensation" rather than "insurance", yet we treated his unresponsive, uncalled for, and perhaps inadvertent, remarks as calling for curative, or remedial, action by the court, just as if the witness had blurted

out that the grocery company had public liability insurance, and held:

> "5. Generally, any suggestion by plaintiff, plaintiff's counsel or any of plaintiff's witnesses that defendant is covered by liability insurance, whether accomplished inadvertently or intentionally, is improper and prejudicial to defendant, and an admonition to the jury to disregard same will not necessarily cure the prejudice.
>
> "6. Where, in an action for damages for bodily injuries, the jury is effectively informed by a witness for plaintiff that the defendant is covered by liability insurance, prejudice results, and on appeal by defendant from judgment for plaintiff this court will grant appropriate relief either by requiring a remittitur or directing a new trial."

And we notice that the Supreme Court of one of our sister states (even though giving considerable space in one of its recent opinions to the view that statements having the effect of informing the jury that defendants in such actions are protected by insurance, should no longer be considered prejudicial) recognizes the duty of attorneys to guard against their clients' giving inadvertent testimony of that character. See Muehlebach v. Mercer Mortuary and Chapel, Inc., 93 Ariz. 60, 378 P.2d 741. There the court cited (at p. 742) Consolidated Motors v. Ketcham, 49 Ariz. 295, 66 P.2d 246, as showing the "affirmative duty" attorneys for plaintiffs in such cases have been put under, in that jurisdiction, to prevent such inadvertent disclosures. In the Ketcham Case, the court said (among other things): " * * * It is not sufficient that plaintiff did not mean to bring out the prohibited matter, but he *must* mean not to." (Emphasis added.) Then, in the Muehlebach Case, the same court said (378 P.2d p. 744):

> "Without wishing to quibble, we note that counsel does not state that defendant was told, 'Do not mention the word "insurance".' The question of plain-

tiff's counsel did not call for an answer that would have mentioned insurance, and under the circumstances defense counsel should and could have controlled his own witness well enough so that the word would not have been mentioned."

We find nothing in the record of this case to indicate that plaintiff's interrogator comtemplated, or could have reasonably anticipated, that the question he asked of her would elicit any mention of insurance. (If there was, the question of "invited error" might arise). Consequently, we can only conclude that plaintiff's counsel did not exercise the control over her that proper preparation, or admonition, before the trial, should have accomplished. Counsel says, as apparently an alternative answer to defense counsel's argument, that "the fact that the rights of the defendants were not prejudiced and they received a fair trial is illustrated by the modest amount of the verdict." We do not regard this as a satisfactory answer, or as mitigation for their client's conduct (and counsel does not offer it as a reason for ordering a remittitur). On the contrary, we think that in view of the trial court's failure to take any step whatsoever to alleviate the harm done by plaintiff's prejudicial remark and of the condition of the evidence on some of the matters vitally affecting defendants' liability, this is one of those "close" cases referred to in the quotation from Fike v. Peters, 175 Okl. 334, 52 P.2d 700, included in our opinion in Redman v. McDaniel, Okl., 333 P.2d 500, 503, where granting a new trial offers the only means of undoing the possible harm done, and of fostering justice. We therefore hold that the case of Black Gold Petroleum Co. v. Webb, supra, is not applicable to this case, that the trial court should have sustained defendants' motion for a mistrial, and, failing to do so, should have thereafter sustained their motion for a new trial (alleging that error as one of its grounds).

As, from our examination of the record, the portions of Truhitte's deposition that

were introduced at the trial, appear to be merely cumulative of the oral testimony he gave there, and defendants do not demonstrate prejudice from their introduction into the evidence, and we anticipate that they may not be introduced at a new trial, we think it is unnecessary to rule upon the alleged error in their admission, or consider defendants' arguments as to any other assigned error.

In accord with the foregoing, the order and/or judgment of the trial court overruling defendants' motion for a new trial is hereby reversed, and this cause is remanded to said court with directions to grant them a new trial.

HALLEY, C. J., and WILLIAMS, BERRY and LAVENDER, JJ., concur.

JACKSON, V. C. J., and DAVISON and HODGES, JJ., concur in result.